UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------

ROBERT SHANNON,

        Plaintiff,

  v.                                         **AFFIDAVIT**

VERIZON NEW YORK, INC.,                1:05-CV-0555
                                                             (LEK/DRH)

        Defendant.

-------------------------------------------------------------

STATE OF NEW YORK    )
                                ) ss:
COUNTY OF ALBANY    )

    ROBERT SHANNON being duly sworn, deposes and says:

    1.    I am Plaintiff in this action and submit my Affidavit in opposition to Defendant Verizon's present motion for summary judgment.

    2.    I have 39 years of unblemished and highly regarded work history at Verizon. I never was disciplined or the subject of another employee's grievance, or part of any workplace violence allegations during my career.

    3.    My affidavit sets forth facts which show that I never made a threatening or hostile comment to anyone about Chris O'Connor's death. Defendant Verizon's statements by my manager, James Murray, and investigator, John McNicholas, are either false or distorted and the product of blatant hearsay. They amount to an unreasonable application of Defendant's workplace violence policy and procedures most of which were

ignored.  Instead, Verizon instigated its perfunctory investigation to further carry out Defendant's unlawful discrimination and retaliation against me.

  4. It is important to note that Verizon failed to submit a single affidavit from co-worker Liz Weis, or anyone else, stating what they heard me say that was "threatening" on September 27, 2007 or that I acted in a "hostile" manner in regard to my comment to Liz Weis on September 27, 2007 at the office where we were chatting. Verizon has not produced any evidence from anyone who actually heard what I said to Liz or to Manager James Murray who felt threatened.  This shows that Defendant completely failed to act reasonably by hold a brief security investigation without a shred of accurate information on what was said.

  5. Defendant has presented a confused and distorted September 27, 2007 email from James Murray, my then first line manager, and a distorted and self-serving interview report from a Verizon security investigator to contrive a suspension scenario as part of Defendant's continuing discrimination and retaliation against me.  I am certain Defendant tried to find a co-worker to say he or she heard and was threatened by what I said. Verizon could not do so because of the fact that no one was so affected.

  6. The following events occurred on September 27, 2007. My work schedule that day was from 5:30 a.m. to 2:00 p.m.  On September 27, 2007, at about 6:10 a.m., co-worker Liz Weis approached my work area and asked me about my vacation and what my wife and I saw and did.  I gave Liz brochures from the places we visited.  Liz then

asked if I had heard about Chris O'Connor. I told her I had not and she told me that Chris had committed suicide. I was shocked at the news, as I remembered Chris as a pleasant easy-going person with a bright future.

7. To my recollection, I told Liz Weis that I thought his suicide was a waste of a life and you would think that if things were bothering him that much, he would find other ways to deal with it and eliminate the problem. I was referring to how Chris O'Connor perhaps might have acted, not to how I would deal with a serious emotional problem. I did not state that I would "go postal". Liz did not question what I said or express any fear from this casual remark to her.

8. I went home for lunch at about 11:30 a.m. on September 27 and returned to work at approximately 12:15 p.m. About 1:45 p.m., 15 minutes before I was to go home for the day and almost 7 hours after my casual comment to Liz Weis, Investigator John McNicholas said he wanted to speak to me in the office conference room.

9. McNicholas asked whether I wanted someone to sit in with us. Given my current against Defendant, I first asked for my lawyer then agreed to have James Waddell, a union business agent, join us to take notes. McNicholas put his manager, William Perk, on the speaker phone to listen to the interview.

10. Mr. McNicholas asked if I had had a conversation with my Manager James Murray about Chris O'Connor's suicide earlier that morning. I said I might have had a brief conversation with Murray along the lines of my remark to Liz Weis, while I was in

shock about Chris O'Connor.  Again, that remark referred to what Chris might have done, if he were emotionally troubled, not what I would do.

11. Mr. McNicholas then left the room and about two minutes later returned with Manager James Murray.  Murray did not speak to me about the remark I supposedly made to him or to clarify any questions for him about what I said although he had every opportunity to do so.  Murray appeared to be excited.  He then stated that I was being put on administrative leave and that I was to turn in my keys and was not allowed on company property.  I protested that I was only engaged in "water-cooler" type conversation and did not threaten or could not reasonably be seen as threatening anyone.  But I was then escorted out of the building on Murray's orders.  I was extremely embarrassed and humiliated by these acts of removal in front of my co-workers who work at 11 Wards Lane, Menands, and witnessed this episode.

12. Neither Murray nor McNicholas, upon information and belief, interviewed other employees to determine what they heard me say, whether anyone felt threatened or perceived my remark about Mr. O'Connor's dealing with an emotional problem as a perceived threat to them, or as hostile behavior by me.

13. Verizon did not investigate the matter before or after I was placed on administrative leave on September 27 and October 17, 2007.

14. McNicholas asserts in paragraph 5 of his February 26, 2009 affidavit on Defendant's present motion, a year and a half after he spoke to me in September 2007,

that he "concluded" a "reasonable person would interpret [my] comment about going postal as a 'potential' threat of physical violence." This "conclusion" is totally arbitrary and illogical.

15. James Murray's redacted email, annexed as Exhibit A to McNicholas' affidavit, states only that Murray was "uncomfortable" with my purported remark. However my remark is read, Murray's being "uncomfortable" in no way reflects that the remark was a "threatening" or "hostile" incident, conveyed to Murray which are the only stated grounds to trigger Verizon's "Work Place Violence Policy" McNicholas Affidavit, Exhibit C.

16. Murray's September 27, 2007 redacted email shows Murray's distortion and confusion when he states that "I would laugh from <u>his</u> jail cell". (emphasis added)

17. Murray stated in the emails that he spoke to two Union representatives who stated "a number" of co-workers expressed concern about my remark and "wondered" (who "wondered", the co-workers or the union representatives?) if anything could be done. Verizon has not produced affidavits from the union representatives or others. Murray's self-serving statements are plain hearsay.

18. On March 6, 2009, I spoke to Deb LaMountain at a store in East Greenbush, New York. I showed her Murray's email which she read. She then stated to me that she had no recollection of any Verizon employee expressing any concern to her about what I said on September 27, not did she recall asking Murray "if anything could be done".

19. On March 11, 2009, I spoke with James Waddell. He stated to me that he did not speak with James Murray regarding any Verizon employee's concerns about what I said on September 27, and did not ask "of anything could be done.

20. Barbara Brayton, Verizon Area Manager, and James Murray, my direct Manager who conferred about my purported remark on September 27, 2007.

21. Barbara Brayton and James Murray are principal alleged violators of the ADA in their actions against me prior to Murray's email and throughout this lawsuit. Brayton, for example, refused to, and ordered others not to engage in required reasonable accommodation discussions with me about my request to return to my technician job.

22. Verizon failed to apply its binding "Work Place Violence Policy" procedures to be followed in this incident. Seven page Policy annexed to this affidavit as Exhibit C.

23. Section 13 of that Policy states "Acts or Threats of Violence Defined" as follows: "Threats or acts of violence include conduct against any person(s) or property that is sufficiently severe, offensive, intimidating and/or otherwise inappropriate so as to create a hostile, abusive, intimidating work environment." Policy Exhibit C. My remark, however, it is read, cannot reasonably by deemed to reach this level.

24. Moreover, General and Specific examples of "Work Place Violence" and "Prohibited Conduct" are set forth in Sections 2.0 and 3.0 of Defendant's procedures.

Section 6.1 states the required investigative inquiries which must be made but Defendant intentionally avoided in my situation.

25. Investigator McNicholas also indicates in his affidavit that Verizon was falsely attempting to set me up for a workplace violence accusation. Paragraph 3 of McNicholas' affidavit states that "after receiving Murray's email" McNicholas arranged a meeting with Plaintiff and others. McNicholas says in his Report of September 28, 2007 the interview with Plaintiff began at 1:40 p.m. on September 27. But Murray's email was sent to McNicholas at 1:50 p.m., 10 minutes <u>after</u> McNicholas began the interview. McNicholas' statement in paragraph 5 of his affidavit that he arranged the meeting with Plaintiff "after receiving" Murray's email is false.

26. McNicholas further falsely states in paragraph 5 that he "prepared immediately after that meeting [with Plaintiff on September 27] a memorandum of what transpired at the meeting. But that Memorandum was dated the next day, September 28, 2007, not "immediately" after the September 27 short interview. McNicholas affidavit, Exhibit B.

                                               ___/s/_____
                                               ROBERT SHANNON

Sworn to before me on this
    day of March, 2009

_____/s/_____
Notary Public